## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

CAMERON DIONNE MCDADE,     )
                  )
           Plaintiff,       )
                  )
           v.          )     Case No. 1:20-cv-03203-TWP-MPB
                  )
GABRIEL CLEMENS, Dr., and     )
CONNIE MCCURREY,         )
                  )
          Defendants.     )

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Gabriel Clemens ("Dr. Clemens") and Connie McCurrey ("Ms. McCurrey") (collectively, the "Defendants") (Dkt. 36). Plaintiff Cameron Dionne McDade ("Mr. McDade") filed this civil rights action under 42 U.S.C. § 1983 when he was an Indiana Department of Correction ("IDOC") inmate at Plainfield Correctional Facility ("Plainfield"). (Dkt. 16.) He alleges Plainfield's dentist, Dr. Clemens, and dental assistant, Ms. McCurrey, were deliberately indifferent to his medical needs during and following a tooth extraction in October 2020. *Id.* Defendants contend the designated evidence shows they were not deliberately indifferent to Mr. McDade's dental needs and they are entitled to judgment as a matter of law. For the reasons explained below, the Defendants' motion for summary judgment is **granted**.

## I.  SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Federal Rule of Civil Procedure. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th

Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.  <u>MATERIAL FACTS</u>

Because the Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to [Mr. McDade], the non-moving party and draw[s] all reasonable inferences in [Mr. McDade's] favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

## A.   **The Parties**

At all times relevant to his Amended Complaint, Mr. McDade was an IDOC inmate at Plainfield (Dkt. 16); Dr. Clemens was a dentist employed by Wexford of Indiana, LLC ("Wexford") at Plainfield, (Dkt. 38-1, ¶¶ 1-2); and Ms. McCurrey was a dental assistant employed by Wexford at Plainfield, (Dkt. 38-2, ¶ 1). As a dental assistant, Ms. McCurrey "do[es] not have the authority to provide extractions, prescribe medications, or diagnose patients." *Id.*, ¶ 2. Rather, her role is to assist the dentist as needed in the dental unit at Plainfield. *Id.*

## B.   **Medical Interaction with Defendants**

In Fall 2020, Mr. McDade had a "dental history positive for a cavity of tooth number 32,[1] and Dr. Clemens' plan was to extract the tooth[.]" (Dkt. 38-1, ¶ 4; Dkt. 38-4 at 4 ("pt seeking extraction . . . #32 reveal[]s caries to radiographic pulp.").)  At this point, Dr. Clemens did not believe the tooth was restorable. (Dkt. 38-1, ¶ 4.)

Dr. Clemens performed Mr. McDade's tooth extraction on October 5, 2020, and "[t]he extraction was rather unremarkable, other than a very small 3-millimeter portion of root that [he] could not remove." *Id.*, ¶ 5; Dkt. 38-4 at 4.  Dr. Clemens attested that often, during extractions, "portions or root fragments cannot be removed without oral surgery," and that usually "these issues will heal on their own," without discomfort or further problems. (Dkt. 38-1, ¶ 5.)  During the extraction, Mr. McDade observed that Dr. Clemens had problems getting the tooth out, broke it, and used several different instruments to try to extract it completely.  (Dkt. 38-3 at 8.)  Mr. McDade's medical record indicates that the "[m]esial root fractured such that PDL space could not be engaged with elevator 3 mm below crest of bone," and Mr. McDade was informed that the root

---

[1] Tooth number 32 is one of the wisdom teeth, in particular, the third molar in the lower right quadrant of the mouth. *See* www.dayodental.com (Last visited Sept. 16, 2022).  Cavities are also called "tooth decay or caries." *See* www.mayoclinic.org (Last visited Sept. 16, 2022).

tip would be left in "in effort to preserve bone." (Dkt. 38-4 at 4.) Dr. Clemens advised Mr.

McDade if he had any symptoms after the extraction, he should seek further dental attention. (Dkt.

38-1, ¶ 5.) Dr. Clemens prescribed Ibuprofen 600 mg for post-extraction pain. (Dkt. 38-4 at 4.)

Four days later, on October 9, 2020, Mr. McDade submitted a healthcare request form

stating:

> Something is wrong, it's been five days since the surgery. I can visually see an[d] feel a piece of broke off bone pushing through my gumline. It is causing sharp pain that is affecting the right side of my face. From the bottom of my jawline to my temple, causing headaches, an[d] my right eye to water often preventing me from regularly eating and sleeping. Only relief is when I take a[n] Ibuprofen that was given, then the pain returns. Something has to be done[,] this pain is unreal for the tooth to be already removed. Thank [you]!

(Dkt. 38-4 at 1.) Ms. McCurrey received the request, and Mr. McDade was scheduled for a visit

with the provider on October 13, 2020. *Id*. Mr. McDade was in segregation at the time and he

relied on staff to transport him for medical appointments; because he was not transported, he was

unable to appear for this appointment.[2] (Dkt. 38-4 at 1, 4.) Although Dr. Clemens does not receive

healthcare request forms, he was aware that Mr. McDade was scheduled for this appointment but

did not show. (Dkt. 38-1, ¶ 6.)

Ms. McCurrey rescheduled Mr. McDade for an appointment on October 20, 2020, within

seven days of his missed appointment. (Dkt. 38-2, ¶ 5.) On October 14, 2020, Mr. McDade

submitted two additional healthcare request forms reporting that he was in pain and needed to see

the dentist. In the first request he stated:

---

[2] Mr. McDade attests that he filed a grievance to get medical assistance and that once the dental unit was notified by the grievance specialist, Ms. McCurrey sent him a letter stating that he refused his October 13, 2020 appointment. (Dkt. 38-3 at 5.) He contends he was never on the schedule for the October 13, 2020 appointment, and that because he was in segregation at the time, he relied on staff to transport him for medical appointments and he was unable to refuse such appointments. *Id.* Ms. McCurrey asserts she was not aware that any grievance had been filed regarding Mr. McDade's dental care, and that she would not be automatically notified because she is not involved in the grievance process. (Dkt. 38-2, ¶ 9.) As to the missed appointment, the Court does not find that this creates a genuine issue of material fact, because it is undisputed that Mr. McDade, for whatever reason, did not attend this appointment, however, he was rescheduled for another appointment shortly thereafter.

> On 10/11/20 I was given a KOP non-aspirin tablet[] for the pain I am receiving from an ongoing dental surgery. At this point I have still not been seen by the dentist, an[d] the pain has not subsided. I am in a lot of pain an[d] need some more pain reliever medicine as soon as time permits. Thank [you]!

*Id*. at 2. The Health Care staff member responded to this request on October 15, 2020 stating, "You have been on the schedule to come to Dental and was no show[;] you will be called again." Mr. McDade's second request on October 14, 2020 stated:

> On 10/10/20 I sent a request for healthcare informing you of the pain I am receiving from the surgery done on 10/5/20. As of today, I am still in great pain that has not subsided and is effecting [sic] my daily routine[,] as far as eating, sleeping and exercising regularly. This broken piece of tooth sticking out of my gumline, causing this pain in my mouth needs to be extracted immediately, before it causes more risk to my health. Please!!

*Id*. at 3. On the same date, the Health Care staff member responded only "Dup". Ms. McCurrey "noted in response that Mr. McDade had been scheduled to see the dentist but did not show for his appointment, and that he had been rescheduled." (Dkt. 38-2, ¶ 6.)

Dr. Clemens saw Mr. McDade on October 20, 2020, for what he characterized as continued discomfort. (Dkt. 38-1, ¶ 7.) Because Dr. Clemens "was concerned about the potential presence of an infection in the area of the extraction," he prescribed amoxicillin to address any such issue, along with additional Ibuprofen for pain. *Id.*; Dkt. 38-4 at 4-5. At this time, Dr. Clemens believed that Mr. McDade "may at some point benefit from surgical remodeling of the bone, such as [alveoloplasty],"[3] and he instructed Mr. McDade to return for further follow-up in a few days. (Dkt. 38-1, ¶ 7.)

Mr. McDade returned again on October 29, 2020, and Dr. Clemons recorded that "Pt states he is continuing to experience discomfort associated with the area of extraction #32 on 10/5/20."

---

[3] "An alveoloplasty is a surgical procedure that reshapes and smooths out the jaw where a tooth or teeth have been extracted or lost. The part of the jawbone that houses the teeth is called the alveolus, and the 'plasty' means molding, so alveoloplasty is the process of molding or reshaping the jar." *See* www.colgate.com (Last visited Sept. 16, 2022).

(Dkt. 38-4 at 5.)  On this visit, Dr. Clemens noted no signs or symptoms of infection.  *Id.*  However, Mr. McDade had x-rays that confirmed the presence of the root tip.  *Id.*  Dr. Clemens then recommended surgical extraction with an oral surgeon because of the orientation and dense quality surrounding bone.  *Id.*; Dkt. 38-1, ¶ 8.  Dr. Clemens continued pain medication and informed Mr. McDade that he would refer him to an oral surgeon.  *Id.*

Dr. Clemens requested the referral to the oral surgeon on November 17, 2020.  *See* Dkt. 41-1 at 12-13.  The regional medical director approved Dr. Clemens' request two days later, and Mr. McDade was scheduled for his oral surgery within four weeks.  *Id.* at 13.

### C.    <u>Oral Surgery and Follow Up</u>

On December 17, 2020, the oral surgeon performed an extraction of the retained root fragment left in Mr. McDade's gum. (Dkt. 38-4 at 6.)  The oral surgeon noted that Mr. McDade's previous extraction site was "healing well" with no acute signs of infection, and after the procedure, he prescribed Ibuprofen 600 mg for a week.  *Id.*  Dr. Clemens saw Mr. McDade after this surgery and noted that "he no longer had ongoing complaints of pain," and the maintenance of good oral hygiene was discussed to move forward.  (Dkt. 38-1, ¶ 10.)

Dr. Clemens opines that "it is not uncommon for small fragments of an extracted tooth to remain following extraction. Most often, these conditions are monitored, for any sign of abnormality, and if there are further symptoms, infections, or other abnormalities patients can then be referred to an oral surgeon."  *Id.*, ¶ 12.  It was his medical opinion that sending Mr. McDade to an oral surgeon for ultimate removal of the root tip was appropriate.  *Id.*, ¶ 13.

### III.    <u>DISCUSSION</u>

Mr. McDade contends that Defendants agreed to extract tooth #32 in what should have been a "a standard type of dental care for prisoners" but because of Defendants' deliberate

indifference to his serious medical need, the result was "an infection and prolonged dental care for a serious inflection [sic] of pain and suffering for the Plaintiff." (Dkt. 41 at 2.)  Dr. Clemens attests that this treatment approach was not deliberately indifferent and that he had not delayed treatment. The Defendants argue that Mr. McDade "was seen on a number of different occasions by dental staff, received a tooth extraction, pain medication, antibiotics, an x-ray, and a referral to an oral surgeon with corresponding oral surgery." (Dkt. 37 at 2.)  Having considered the parties briefing and the designated evidence, the Court concludes that Defendants are entitled to summary judgment in their favor, as they were not deliberately indifferent to Mr. McDade's dental condition.

A.    **Eighth Amendment Deliberate Indifference Standard**

Because Mr. McDade was a convicted prisoner at all relevant times, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014).  "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 772, 727-28 (7th Cir. 2016) (en banc).  The Defendants do not dispute that Mr. McDade's dental needs constituted a serious medical condition.  Thus, the availability of judgment as a matter of law turns on whether there is sufficient evidence upon which a reasonable jury could conclude that they were deliberately indifferent to Mr. McDade's dental condition.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728. A court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id.* "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42.

An inmate does not have a constitutional right to demand specific medications or treatment. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm."). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would

have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at 409.  "Disagreement between a prisoner and his doctor, or even between medical professionals, about the proper course of treatment is generally insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

The Court will first address the claim against Dr. Clemens, before turning to the claim against Ms. McCurrey.

**B.    Dr. Clemens**

Mr. McDade argues that Dr. Clemens broke his tooth during the extraction as a "time saving practice," or cost cutting measure,[4] negligently left behind a root tip, which caused him to develop an infection and to have "over 70 days of extreme pain and suffering" by delaying or prolonging treatment and due to his treatment approach during the extraction.  (Dkt. 41 at 2-4.) Mr. McDade attests that Dr. Clemens told him to bare the pain for 10 days, and if things did not get better, he would order an x-ray and a referral to the oral surgeon, and that Dr. Clemens delayed submitting the referral to the oral surgeon for three weeks. *Id.* at 4.  Mr. McDade believes that Dr. Clemens should have referred him to the oral surgeon immediately once an infection set in. *Id.* at 7.

First, Mr. McDade contends that Dr. Clemens broke his tooth to save time because many other inmates were scheduled for dental treatment on the date of the incident, and Dr. Clemens' decision to leave the root tip was inappropriate.  (Dkt. 41 at 2.)  But a doctor's treatment decisions are entitled to a great deal of deference. *See Petties*, 835 F.3d at 729; *Pyles*, 771 F.3d at 409.  "The

---

[4] The Defendants correctly point out that much of Mr. McDade's response argues that cost-cutting measures resulted in the Defendants' deliberate indifference, but that Mr. McDade is not proceeding with a policy or practice claim against Wexford under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978).  (Dkt. 44 at 2.) Indeed, Mr. McDade concedes he is not proceeding on *Monell* claims. (Dkt. 41 at 18.) Thus, the Court need not consider his arguments regarding policies, practices, or widespread problems he claims are related to cutting financial costs that affected dental care. Moreover, there is no evidence that Dr. Clemens proceeded as he did during the extraction to "save time".

federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards of practice that it calls into question whether the doctor was actually exercising his professional judgment." *Pyles*, 771 F.3d at 409 (where prisoner wanted different treatment because his medications were not helping, his disagreement with the physician did not allow him to prevail on his Eighth Amendment claim where the physician's choice of treatment was not blatantly inappropriate).

Mr. McDade has designated no evidence to establish that Dr. Clemens did not use his professional medical judgment during the extraction or that his decision to leave the root tip was a departure from standard practice.  Rather, Dr. Clemens admitted there was difficulty extracting the tooth, (Dkt. 44 at 3), but it is not uncommon for a patient to have portions or root fragments that cannot be removed without oral surgery. (Dkt. 38-1, ¶ 5.) Dr. Clemens attested that this occurrence often heals on its own, so he instructed Mr. McDade to seek follow-up care if he encountered problems. *Id.* Mr. McDade received a prescription for Ibuprofen following the procedure to manage any post-extraction pain.  (Dkt. 38-4 at 4.)

When Mr. McDade sought additional care, Dr. Clemens saw him after his missed appointment on October 13, 2020, was rescheduled a week later.  (Dkt. 38-1, ¶¶ 6-7.)  There is no evidence to establish that Dr. Clemens was somehow responsible for Mr. McDade's missed appointment.  During the October 20, 2020 dental visit, Dr. Clemens noted that Mr. McDade was experiencing lingering discomfort, and he recorded that he was "concerned about **the potential presence of an infection** in the area of the extraction." *Id.*, ¶ 7 (emphasis added).  Despite Mr. McDade's argument that he had an *actual* infection by October 20th, Dr. Clemens only noted his concern for a potential infection.  *Id.*, Dkt. 41 at 4.)  Regardless of a potential or actual infection,

Dr. Clemens treated Mr. McDade for an infection by prescribing amoxicillin "to address any potential signs of infection" and continued Ibuprofen for Mr. McDade's pain.  (Dkt. 38-1, ¶ 7.)

When Mr. McDade returned to the dental office on October 29, 2020 for additional treatment, Dr. Clemens noted that there were "no signs or symptoms of infection."  *Id*.  Dr. Clemons took x-rays, and determined that due to "the continued presence of the root tip" and the quality of Mr. McDade's surrounding bone, a referral to the oral surgeon to remove to the root tip was now appropriate.  *Id.*, ¶ 8; Dkt. 38-4 at 5 (medical record documents no signs of infection). Dr. Clemens again ordered Ibuprofen for Mr. McDade's pain.  (Dkt. 38-1, ¶ 8; Dkt. 38-4 at 5.)

Mr. McDade's argument that it would then take Dr. Clemens three weeks--through November 17, 2020--to submit his referral to the oral surgeon, is well taken.  (Dkt. 41-1 at 12.) But that referral was approved in short order--two days later--and Mr. McDade had his root tip removed by the oral surgeon within four weeks after the referral was made.  *Id.* at 12-13; Dkt. 38-4 at 5-6.  Importantly, Mr. McDade has designated no evidence that any delay of his referral to the oral surgeon or delay of his second surgery, exacerbated his injury.  *See Langston v. Peters*, 100 F.3d 1235, 1241 (7th Cir. 1996) ("[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.") (internal quotations and citation omitted), *cited with approval in Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019).  Rather, at the December 17, 2020 appointment, the oral surgeon documented that Mr. McDade's extraction site was "healing well" and that there were no acute signs of infection.  (Dkt. 38-4 at 6.)  After the oral surgery, the surgeon prescribed the same pain medication that Dr. Clemens had prescribed, Ibuprofen 600 mg.  *Id.*  Even outside of prison, a patient is not entitled to

demand specific care—including referral to the oral surgeon—in the fast-tracked timeframe Mr. McDade desired.

Further, Mr. McDade fails to establish that no minimally competent professional would have responded like Dr. Clemens.  In regard to his complaints of pain, Dr. Clemens ensured Mr. McDade's pain medication was continued, and this medication was ultimately unchanged by the oral surgeon.  Mr. McDade admits that the Ibuprofen 600mg. "provided a certain amount of relief at certain moments of time."  (Dkt. 41 at 12.)  To the extent that he argues the pain medication did not completely leave him pain free, Mr. McDade's condition was such that pain can occur and that more follow-up care could be necessary after his initial tooth extraction.  The Court sympathizes greatly with Mr. McDade's pain and discomfort after his initial dental procedure, but he has not shown that any of his treatment was ineffective because Dr. Clemens failed to eliminate his pain completely.  *See, e.g., Leiser v. Hoffmann, et al.*, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("[D]octors are not deliberately indifferent when they are unable to eliminate completely a patient's pain.") (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Finally, the Court must examine the totality of Mr. McDade's dental care when evaluating whether the Defendants were deliberately indifferent.  *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).  Deliberate indifference "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks."  *Donald v. Wexford Health Sources*, 982 F.3d 451, 458 (7th Cir. 2021) (internal quotations omitted).  The Court does not doubt that Mr. McDade experienced considerable pain because dental pain can be a harrowing experience. But Dr. Clemens did not ignore or disregard Mr. McDade's condition.  His condition was monitored throughout the extraction and in follow-up care; he was provided continued medication for pain and to address any potential for infection; and he received x-rays. He was then referred to an oral

surgeon for a second procedure that corrected the underlying issue of the remaining root tip.  As a result, Mr. McDade no longer has a problem with his tooth or the extraction site.  Under these circumstances, no reasonable fact-finder could conclude that Dr. Clemens was deliberately indifferent to Mr. McDade's dental condition.  Accordingly, Dr. Clemens is entitled to summary judgment.

**C.     Ms. McCurrey**

Mr. McDade argues that Ms. McCurrey ignored his serious medical needs by not following up to see why he missed his October 13, 2020 appointment and by not timely scheduling him for emergency treatment.  (Dkt. 41 at 11.)

When Ms. McCurrey received Mr. McDade's request for additional care four days after his extraction, she scheduled him for an appointment on October 13, 2020.  (Dkt. 38-2, ¶ 5; Dkt. 38-4 at 1.)  It is undisputed that Ms. McCurrey does not have the authority to provide extractions, prescribe medication, or diagnose patients.  (Dkt. 38-2, ¶ 2.)  The Court finds that her responses to Mr. McDade's healthcare request forms were sufficient and do not establish that she was deliberately indifferent to his dental care.

Mr. McDade argues extensively that there is no possible way he could have refused to attend this appointment, that he filed a grievance about not receiving dental care that Ms. McCurrey was immediately made aware of, and that she falsified a letter and medical records indicating that he missed this appointment.  (Dkt. 41 at 3.)  But Mr. McDade has designated no evidence that Ms. McCurrey was aware of any grievance or that she falsely documented that he did not attend his appointment.

It is undisputed that Mr. McDade did not appear for this appointment.  (Dkt. 38-4 at 4.)  In the light most favorable to Mr. McDade, the Court accepts that missing this appointment was not

the fault of Mr. McDade; however, that does not establish that Ms. McCurrey was deliberately indifferent to Mr. McDade's medical needs.  It is unclear why his appointment was missed, as he was in segregation and had to be escorted by custody staff to the dental unit.  There is no evidence to support that this issue was somehow caused by any medical staff versus custody staff.[5]

But, the issue of the missed appointment does not create a genuine issue of material fact. Ms. McCurrey's testimony and the medical record indicates Mr. McDade was immediately rescheduled for October 20, 2020, within seven days of the missed appointment, to see Dr. Clemens.  (Dkt. 38-2, ¶ 5; Dkt. 38-4 at 1-4.)  Ms. McCurrey's responses to his subsequent healthcare request forms on October 14, 2020 also indicate that he had been rescheduled to see Dr. Clemens for the upcoming appointment.  (Dkt. 38-4 at 2-3.)  It is undisputed that Mr. McDade saw Dr. Clemens on October 20, 2020 and received medication for potential infection and continued pain medication.  The record does not indicate that Ms. McCurrey received any additional healthcare request forms to respond to, and it is clear that she could not provide further treatment, diagnostic testing, or referral to the oral surgeon in her role as a dental assistant.  Mr. McDade received follow-up care from Dr. Clemens on October 29, 2020, and then received his oral surgery by the end of the year.

There is no evidence to show that Ms. McCurrey ignored Mr. McDade's dental needs or somehow circumvented him from seeing the dentist.  No reasonable fact-finder could conclude that Ms. McCurrey was deliberately indifferent to Mr. McDade's medical needs, and therefore, she is entitled to summary judgment.

---

[5] "Through thorough investigation, Defendants have been unable to determine if this missed appointment was due to any action of Plaintiff, or actions of custody staff. However, for purposes of summary judgment, the specific basis for the appointment being missed is irrelevant, because as it relates to Ms. McCurrey, she would have been aware that Plaintiff had an appointment, did not appear for his appointment, and noted that Plaintiff would be rescheduled, which occurred." Dkt. 44 at 2. The Court agrees with this argument proffered by the Defendants.

## IV.  <u>CONCLUSION</u>

For the reasons explained above, the Defendants' Motion for Summary Judgment, Dkt.

[36], is **GRANTED**.  Final Judgment consistent with this Order and the Court's Entry Screening

Amended Complaint (Dkt. 17) shall now issue.

**SO ORDERED.**

Date:  9/22/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Cameron Dionne McDade
2608 Andy Drive
Indianapolis, Indiana  46229

Douglass R. Bitner
STOLL KEENON OGDEN PLLC
doug.bitner@skofirm.com